UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STEVON ANZALDUA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13CV01257 ERW |
| | ) | |
| NORTHEAST AMBULANCE and | ) | |
| FIRE PROTECTION DISTRICT, et al. | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

This matter comes before the Court on Defendants' Motion for Summary Judgment [ECF No. 33].

## I.    BACKGROUND

On July 2, 2013, Plaintiff Stevon Anzaldua ("Plaintiff") filed a Complaint against Northeast Ambulance and Fire Protection District ("Fire District"); Fire District Board of Directors Derek Mays, ClarenceYoung, and Bridget Quinlisk-Dailey, in their official capacities (collectively referred to as "Board"); Board Directors Robert Lee and Derek Mays, in their individual capacities; Fire District Fire Chief Quinten Randolph, individually and in his official capacity; Fire District Battalion Chief Kenneth Farwell, individually and in his official capacity; and individual Kate Welge [ECF No. 1].   In his Complaint, Plaintiff alleged his employment with Fire District was terminated on September 26, 2012, as a result of a conspiracy among the defendants.  In Count I, Plaintiff brought a claim pursuant to 42 U.S.C. § 1983, alleging the termination violated his First Amendment right to free speech, against Defendants Lee, Mays, Quinlisk-Dailey, Randolph, and Farwell ("Fire District Defendants").  Under Count II, Plaintiff sued Fire District, Fire District Defendants, and Defendant Welge for conspiracy to violate his

constitutional rights, cognizable under 42 U.S.C. § 1983. In Counts III and IV, Plaintiff also alleged Farwell and Welge violated federal and state computer privacy laws.

Fire District Defendants filed a Motion to Dismiss on August 26, 2013. On October 21, 2013, this Court granted, in part, Fire District Defendants' Motion to Dismiss [ECF No. 15]. In its Order, the Court dismissed with prejudice Counts II, III, and IV of Plaintiff's Complaint, for failure to state a claim. The Order also dismissed with prejudice Plaintiff's claims brought against individual defendants in their official capacities, and Plaintiff's cause of action for municipal liability against Fire District, contained in Count I of his Complaint. Because no claims remained against Fire District, the Order dismissed the district from the action. Additionally, the Order dismissed, as abandoned, any due process claims asserted by Plaintiff in his Complaint, and dismissed with prejudice all claims against Defendants Clarence Young, Bridget Quinlisk-Dailey and Quinten Randolph. The Court denied, in part, Fire Defendants' Motion to Dismiss, finding Count I of Plaintiff's Complaint sufficiently alleged colorable claims against Lee, Mays, and Farwell, in their individual capacities, to survive a dismissal motion.

Plaintiff filed "Plaintiff's Motion to Reconsider Memorandum and Order Dated October 21, 2013 (Doc.15), or Alternatively, Motion for Leave to Amend Complaint" on October 28, 2013 [ECF No. 18]. In his Motion asking the Court to reconsider its dismissal with prejudice of Fire District and Randolph as parties, and of Counts II, III, and IV in their entirety, Plaintiff, noted he was thus prevented from amending his Complaint to state claims for relief, and requested leave to file an amended complaint. Plaintiff argued justice required that he be granted permission to amend his Complaint to address the deficiencies identified in the Court's Order, because the Court did not find any amendment would be futile, only that there were insufficient factual allegations to support plausible claims for relief.

On November 27, 2013, the Court issued a Memorandum and Order, holding Plaintiff's Motion to Reconsider in abeyance, pending Plaintiff's submission of a proposed amended complaint [ECF No. 28]. Subsequently, Plaintiff timely filed a motion, seeking leave to file his proposed Amended Complaint [ECF No. 29, 29-1]. Defendants Farwell, Lee, Fire District, and Randolph filed a Memorandum in Opposition to Plaintiff's Motion; and Plaintiff filed a Reply [ECF Nos. 38, 44]. On February 5, 2014, this Court issued an Order granting, in part, Plaintiff's Motion for Leave to File First Amended Complaint [ECF No. 49]. Plaintiff was granted leave to file an amended Complaint asserting Count I (42 U.S.C. Section 1983 Violation of Anzaldua's Constitutional Rights Cognizable Under 42 U.S.C. § 1983) and Count II (Conspiracy to Violate Anzaldua's Constitutional Rights Cognizable Under 42 U.S.C. § 1983), as pleaded in the proposed First Amended Complaint. However, Plaintiff was denied leave to file a First Amended Complaint asserting Count III (Anzaldua's Cause of Action Under 18 U.S.C. § 2707 Against Defendants Farwell and Welge) and Count IV (Anzaldua's Cause of Action Under Section 537.525 of the Missouri Revised Statutes Against Defendants Farwell and Welge), as amendment would be futile.

Plaintiff's First Amended Complaint is brought against Fire District, and against defendants Lee, Mays, Randolph and Farwell, in their individual capacities [ECF Nos. 53, 53-1, 53-2, 53-3, 53-4]. The Complaint asserts two claims: Count I – 42 U.S.C. Section 1983 Violation of Anzaldua's First Amendment Right to Free Speech (against Fire District, Lee, Mays, Randolph, and Farwell); and Count II – Conspiracy to Violate Anzaldua's Constitutional Rights Cognizable under 42 U.S.C. § 1983 (against Lee, Mays, Randolph, and Farwell).

On December 16, Defendants moved for an extension of time to file a motion for summary judgment based on qualified immunity, and for leave to file in excess of page limitation

[ECF No. 30].  The Court granted Defendants' motion, ordering, among other things, that any motion for summary judgment based on qualified immunity be filed no later than December 18, 2013 [ECF No. 32].  Defendants timely filed their Motion for Summary Judgment, based on qualified immunity [ECF Nos. 33, 34, 35].  Plaintiff filed a motion to defer ruling on Defendants' Motion for Summary Judgment, and, as well, a motion to strike, on the basis of excessive length, Defendants' Memorandum in Support of Their Motion for Summary Judgment [ECF Nos. 36, 37].  In his Motion to Defer, Plaintiff asserted that, because he had not yet had the opportunity to engage in any written discovery and would need to conduct depositions after he obtained the documents, he needed a discovery period of at least four or five months, and twenty-one days after the close of such discovery, to respond to Defendants' dispositive motion.  The Court denied Plaintiff's Motion to Defer on February 5, 2014, and ordered Plaintiff to file his Response to Defendants' summary judgment motion within twenty-one (21) days [ECF No. 50].  Subsequently, the Court granted leave for Randolph to join in the pending Motion for Summary Judgment [ECF No. 52].  On February 26, 2014, Plaintiff filed his Response to Defendants' summary judgment motion [ECF Nos. 57, 59].  Thereafter, Defendants filed their Reply in Support of their Motion for Summary Judgment Based on Qualified Immunity [ECF No. 61], and "Defendants' Reply in Support of Their Statement of Uncontroverted Material Facts and Response to Plaintiff's Statement of Additional Material Facts" [ECF No. 62].

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Federal Rule of Civil Procedure 56(c) provides that "[a] party asserting that a fact cannot be, or is genuinely disputed must support the assertion by: (A) citing to particular

parts of materials in the record, . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." E.D. Mo. L.R. 7-4.01(E).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment will not lie if a genuine dispute about a material fact is shown; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In ruling on a motion for summary judgment, the Court may not make credibility determinations, weigh the evidence, or draw inferences from the facts. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

To satisfy his initial responsibility, the summary judgment movant must inform the court of the basis for his motion and must identify those portions of the record that he believes demonstrate the absence of a genuine issue of material fact. *Id.* at 1042. Once the moving party has discharged the requisite evidentiary burden, the nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." *Id.* (citations omitted). If the nonmovant fails to produce such evidence, summary judgment in favor of the moving party is proper. *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## III. STATEMENT OF UNDISPUTED OR UNCONTROVERTED MATERIAL FACTS

The following statement of undisputed or uncontroverted material facts is derived from the Statement of Uncontroverted Material Facts in Support of Defendants' Motion for Summary

Judgment, Plaintiff's Statement of Controverted Material Facts Making Summary Judgment Improper, Defendants' Reply in Support of their Statement of Uncontroverted Material Facts and Response to Plaintiff's Statement of Additional Material Facts, the parties' pleadings and responses thereto, and uncontroverted exhibits of record.

At all times relevant to this lawsuit, Mays and Lee were Board Members of Fire District. Both individuals are sued by Plaintiff in their individual capacities. Farwell serves as Battalion Chief and Chief Medical Officer of Fire District, and he is sued by Plaintiff in his individual capacity. Randolph, also sued in his individual capacity, serves as Fire Chief for the district.

Fire District hired Plaintiff as a part-time paramedic in January of 2008. During his employment, Plaintiff had access to all of the district's policies and procedures. Fire District offered Plaintiff a position as a full-time paramedic and firefighter on April 13, 2011. Pursuant to standard practice when beginning a new position, Plaintiff began a one-year probationary period on that date.

In April 2012, an investigation was conducted when a hole was discovered in one of Fire District's ambulances after Plaintiff and his then-partner, Adam Weinstein, turned the vehicle in at the end of their shift. On April 5, 2012, Farwell issued written reprimands to Plaintiff and Weinstein, for neglect of equipment and neglect of property. Plaintiff signed his reprimand, but stated he did not agree with the disciplinary action. In conjunction with the issuance of the written reprimand, Randolph sent Plaintiff a letter notifying him that his probationary period would be extended an additional six months, due to "professional misconduct and general behavior," and noting that "any further reprimands, verbal or written, or any conduct worthy of disciplinary action will subject [Plaintiff] to immediate termination" [ECF No. 34-8].

On July 21, 2012, Lieutenant and Medical Officer R. W. Lee wrote a memorandum to Farwell, sending copies to Battalion Chief Boling, Plaintiff, and one of Plaintiff's coworkers [ECF No. 34-9]. The memorandum concerned a missing ambulance report, and reported Lee's determination that the crew responsible for the missing ambulance report was comprised of Plaintiff and his co-worker, Sasha Zubrisky.

At all times relevant to this action, Dr. David Tan was an assistant professor of emergency medicine at Washington University, and served as the Medical Director of Fire District. Fire District had a contract for medical oversight with Washington University, and Dr. Tan provided this service, but Dr. Tan was not employed by, or directly within the chain of command, for Fire District.

On July 31, 2012, Farwell received the following email from Plaintiff's email account:

Dear Dr. Tann (sic)

This is Stevon Anzaldua. I wish this was on better terms that I was contacting you. I do realize you are the medical director and are not directly exposed to the day to day operations of this district as it is not in your job description. I almost feel like I am going to the wrong person and my intention is not to put you in the middle of anything. I don't know where else to turn to. I am making you aware that there are some major issues with the EMS side of operations. In starting, not everyone in this department is operating under the same rules. Certain (sic)

[ECF Nos. 34 at 4, 34-3, 34-4, 34-10]. Farwell believed the July 31 email, which came from Plaintiff's email account, was sent by Plaintiff. Chief Randolph directed Farwell, as Fire District's Chief Medical Officer and Battalion Chief in charge of EMS, to investigate Plaintiff's concerns [ECF Nos. 34-3, 34-4]. Farwell sent an email to Plaintiff on July 31, 2012, stating he was:

concerned and obligated to inquire and investigate your concerns, **"not everyone in this department is operating under the same rules."** Please provide for me in writing the **Where, When, How, What, and Who** of your concerns by the end of the day of Aug 2, 2012[.]

[ECF Nos. 34-3, 34-10].  Plaintiff failed to respond [ECF Nos. 34-3, 34-11, 57-1].  Farwell

questioned Plaintiff about the Tan email in a telephone conversation on July 31, 2012 [ECF Nos.

34-3, 57].  Plaintiff told Farwell he did not send the email to Dr. Tan [ECF Nos. 34-11, 57-1].

On August 6, 2012, Farwell sent a memo to Randolph and Deputy Fire Chief Bilal L.B.

Olushola, with copies provided to Fire District's Board of Directors [ECF Nos. 34-3, 34-11].

The memo discussed Plaintiff's email to Dr. Tan, and reported Farwell's directive to Plaintiff to

provide an explanation of his concerns.  In this memo, Farwell stated, "As of August 6, 2012, I

have not received any phones (sic) call, text message, or a[n] email from Firefighter/Paramedic

Anzaldua, explaining his concerns he requested of Dr. David Tan" [ECF Nos. 34-3, 34-11].

At the Board's direction, Olushola sent Plaintiff, on August 7, 2012, a Notice of Hearing

for August 13, 2012.  The Notice stated:

> On July 24, 2012, you forwarded an email to Dr. David K. Tan suggesting that
> "major issues" existed within the District's EMS division.  You went on to
> suggest that the District was engaging in "rule" bending for certain employees.
> Dr. Tan is not within your department chain of command and he does not handle
> interdepartmental grievances.  Your public statements therefore appear to be
> divisive, inflammatory, and without merit.  When provided an opportunity by
> Battalion Chief Kenneth Farwell to elaborate on your statements, you failed to do
> so within the time allotted.  Such failure strengthened the belief that your
> statements were intentionally perverse and improperly motivated.
>
> Such behavior, if deemed true, is a direct violation of the District's code of conduct.

[ECF Nos. 34-1, 34-12].  The August 7, 2012 Notice of Hearing further stated: "You will be

allowed union representation if you so desire."

On August 15, 2012, Farwell emailed Randolph and the Board Members to report that

Plaintiff's mother was taking pictures of Farwell's personal business, Da Elite Bar & Grill, and

pictures of Fire District vehicles at his business. [ECF Nos. 34-3, 34-13].  On August 17, 2012,

Farwell emailed the Board Members and Randolph to report that Plaintiff's mother was

"stalking" him and taking pictures of his personal property. These incidents, and the prior

discipline Farwell had issued to Plaintiff, caused a strained relationship between Plaintiff and

Farwell, his superior officer.

On August 20, 2012, during a closed session, the Board decided to suspend Plaintiff for

ten days for his refusal to respond to Farwell's directive to provide information regarding his

complaints about Fire District. At the Board's direction, Olushola sent Plaintiff a Notice of

Suspension and "Last Chance Letter," informing Plaintiff he would be suspended without pay for

ten shift days, due to the Board's determination he had "failed to respond to a directive issued by

a chief officer[,]" a failure the Board deemed "unacceptable" [ECF Nos. 34-1, 34-12, 34-15, 34-

17]. The letter stated any future misconduct, without regard to its severity, would result in

Plaintiff's immediate termination.

On August 23, 2013, Farwell received an email, sent from Plaintiff's email account, with

a forwarded message Plaintiff had sent to an individual named Mary Elizabeth Schmidt, and to

Elizabeth Holland, who was a reporter for the St. Louis Post Dispatch [ECF Nos. 34-3, 34-16,

57]. The email read as follows:

> You have covered the Northeast Ambulance and Fire protection district before on
> a variety of issues. I am currently employed there as a Full-Time
> Firefighter/Paramedic. I am coming to you hoping to remain anonymous. There
> are several issues that are new. Some pertain to pension issues. Others pertain to
> public safety. I have tried to reach out to the directors only to be disciplined for
> 10 days for an email sent to the medical director with critical concerns regarding
> the service we provide citizens as it pertains to medical emergencies. Any time a
> stand is taken on this issue it leads to something punitive in the form of
> suspension or termination. I have been employed there for almost 4 years now we
> have new problems.
>
> We have been shutting down Pumpers (Fire Apparatus) due to staffing mishaps
> (Resulting from CMO). We have SCBA's (Self-contained Breathing Apparatus)
> that are not compliant with NFPA (National Fire Protection Association) 1971.
> This is a guideline to safe practices, policies and equipment. We are told on the
> floor (The workers actually responding to the calls) that we do not have the

money.  We have 6-7 WORKING SCBA's right now in the department.  This is after 2 new Chevy Suburban's were purchased for command staff.  The vehicles totaled somewhere around 100000.00 after the addition of things like Light-Bars and Sirens were added.  One of these Command vehicles is Administrative (Chiefs Vehicle).  The other vehicle is used on shift and DOES respond to calls and assumes command.  This is a "Working" vehicle.  There was nothing wrong with the Chief's vehicle prior to this.  In fact, [t]hat old Chief's [vehicle] is now the "Triage" vehicle equipped with ALS (Advanced Life Support) equipment which is staffed by the Chief Medical Officer running at 4707 (Call sign).  This vehicle is "suppose" to respond to calls during the CMO's duty hours.  If you call North Central dispatch (314-428-1133) you can actually get the numbers of 4707 (Command Vehicle) responses.  This point is simple.  The safety of the men is secondary to command vehicles.  We are already understaffed and short on working SCBA's which are not NFPA Sec. 1971 compliant which means the district assumes legal liability if any Death/Disability occurs as a result of a structure fire/Fire.  This is a safety issue to ALL of my Peers on the floor.  These Vehicles somehow managed to be a priority over our safety.

I would like to address the issue of the Chief Medical Officer and his vehicle.  The vehicle leaves the district (Normandy) everyday with him to go home (O'Fallon 30 miles away).  This vehicle does NOT respond to calls when he is gone.  The numbers will show that.  This Vehicle has actually been parked outside of his bar.  I have multiple photo's time-stamped and dated of the vehicle parked behind his bar (Da Elite Bar/Grill).  This District vehicle was being used for personal business conducted at a bar with Tax-Payer gas.  IT has since been parked in the back of the firehouse.  The CMO (Chief Medical Officer) deals with the EMS (Emergency Medical Services) or Ambulance side of operations.  He has been sending out text discussing his bar specials via district telephone.  As of August 22nd, the DEA has pulled our controlled substances because the CMO Failed to renew the license for these substances.  Now we have a PUBLIC safety issue.  This affects the people we serve as well as the Paramedics['] ability [to] stabilize medical emergencies such as seizures.  No pain meds for Chest pain or fractures prior to immobilization of the injury.

So you may ask why I come to you with this.  I was recently suspended for 10 days as a result of an email I was going to send to the Medical Director (This is a Doctor) discussing supply issues.  The CMO was made aware of this email and put me in front of the board charged with conduct unbecoming.  He also charged me with breaking the chain of command.  I am currently serving my suspension.  They (CMO and a Bat. Chief) have extended my probation and written me up and tried to fire me 3 times.  They can do this because I am still currently on probation and not entitled to union legal counsel or representation even though I am a member.  I have been a Paramedic going on 13 years.  I have been in the field for 15 years total.  They have circumvented my shift supervisor and gone directly to disciplinary action.  My Shift supervisors have saved my job.  I love my job and Co-workers.  I figure if I get terminated and these problems get fixed to provide a

better safer service to the people and the firefighter/paramedics . . . then it was worth it. I would prefer for this to stay confidential. There is more to this if you have any additional questions please reply if you see this as something you could help change[.]

[ECF No. 34-16]. Farwell did not know who sent the email, but on that same day, he forwarded the email to Board Member Lee.

On August 30, 2012, Randolph, Farwell, and others attended a meeting in Jefferson City, Missouri regarding the District's lapsed narcotics license [ECF No. 34-3]. On August 31, 2012, Holland wrote an article in the St. Louis Post Dispatch entitled "Northeast fire district is grilled over mishandling state drug paperwork" [ECF No. 53-2].

"Minimum manning" (i.e., manpower coverage), implemented by Fire District due to financial restraints, was discussed at a December 6, 2011 Board meeting, and the minutes from that meeting indicated "there were no problems arising from minimum manning" [ECF Nos. 34, 34-1, 57-5]. Fire District could not afford to run two pumpers and two ambulances in 2012. Fire District had many more ambulance calls than fire calls, which contributed to a decision to use only one pumper.

In August 2012, money had already been allocated for new SCBAs, and Fire District personnel were informed of this circumstance. Fire District paramedics and firefighters conducted testing in 2012 to determine the best type of new SCBAs for the district to purchase [ECF No. 34-17]. Plaintiff and his co-workers actively tested different SCBAs to determine which worked best and functioned at the highest safety standards [ECF No. 34-17]. Prior to August 2012, Battalion Chief Newberry told Fire District firefighters and paramedics that once the paramedics and firefighters decided which of the breathing devices was to their liking for safety and efficacy, Fire District would purchase the ones they recommended. Plaintiff attended meetings where the different options for SCBA were discussed.

In 2012, Fire District purchased two new command vehicles because the prior vehicles were not sport utility vehicles. The cost of the command vehicles purchase in 2012, including necessary modifications, was $63,941. During a March 27, 2012 public Board meeting, the purchase of command vehicles for approximately $64,000 was discussed. During a January 24, 2012 public Board meeting, the Board noted two lifepack monitors were purchased, at the request of the paramedics, for Fire District personnel to use.

Under Fire District's Standard Operating Policy pertaining to vehicle use, "district staff vehicles may be used for reasonable personal travel within a sixty-mile radius of the Northeast Ambulance & Fire Protection District." This policy also provides "[t]he district staff vehicle may be used to transport the chief officer to and from their place of work[,] provided such place of work is within a sixty-mile radius from the Northeast Ambulance & Fire Protection District." As an employee, Plaintiff had access to this policy. Farwell was required to have his District vehicle accessible while he was not at the firehouse, in case he needed to report to the scene of a call.

At the time of his discharge, Plaintiff was a probationary employee of Fire District. Under the Collective Bargaining Agreement ("CBA") between the district and the firefighters' local union, Fire District management reserved the right to terminate probationary employees with or without cause. Under the CBA, Fire District management also reserved the right to extend a probationary period. Plaintiff's probationary period was extended after he was disciplined for neglect of equipment and property.

Although the CBA does not provide probationary employees with a right to Union representation during disciplinary meetings or otherwise, the August 7, 2012 Notice of Hearing for August 13, 2012 (regarding the Tan email), informed Plaintiff, "You will be allowed union

representation if you so desire."  EMS Lieutenant Jennifer Barbarotto, a Shop Steward for the firefighters' local union, attended the disciplinary hearing on August 21, 2012, to assist Plaintiff.

The job of a district paramedic or firefighter requires close working relationships. Firefighters are often placed in dangerous and stressful environments and must be able to work together and trust each other to be safe and effective [ECF Nos. 34-17, 34-18, 34-19, 57].  Lives may be at stake, when trust and a close working relationship does not exist among and between firefighters, paramedics, and their supervisors.  Fire District firefighters are frequently called to serious fires, and must rely on each other in life-threatening situations.

Plaintiff's email to Holland was passed around the fire house [ECF Nos. 34-17, 34-18, 34-19].  Several employees were shocked by the content of the email, and by Plaintiff's action in sending to a member of the press, a message containing what they considered to be numerous false statements [ECF Nos. 34-17, 34-18, 34-19].  The Holland email irritated many employees in the district, and fostered division between Plaintiff and his co-workers, and between Fire District firefighters and Farwell [ECF Nos. 34-17, 34-18, 34-19].

In 2012, Fire District firefighters responding to fires took directions and commands over the radio from Farwell and other Battalion Chiefs [ECF Nos. 34-17, 34-18, 34-19, 76].  The firefighters placed their lives in the hands of Farwell and other Battalion Chiefs, who were giving them direction from the outside.  Their ability to trust Farwell with their lives, and to trust he had in mind, at all times, their best interest, rather than his own personal interests, was of extreme and irreplaceable importance.  If the firefighters did not trust Farwell, they might take different actions, have more trepidation about their actions, or doubt the calls he was making, resulting in situations that could directly lead to the loss of lives.

Mays and Lee believed Plaintiff's email to Holland caused disruption within Plaintiff's department. They believed Plaintiff forwarded his email to Holland, Schmidt, and other individuals, and had the potential to cause further disruption among Fire Districts' firefighters and paramedics, and employees of other districts, as more people learned about Plaintiff's statements in the email. Mays and Lee further believed the Holland email had the potential to cause further disruption if Plaintiff remained employed with the District. Mays and Lee knew numerous aspects of the Holland email were false, and believed Plaintiff knew his statements were false.

On September 13, 2013, Randolph sent Plaintiff a notice of a disciplinary hearing to be held on September 24, 2012, that stated, in part:

> On August 23, 2012, it is believed that you circulated a personal email publicly defaming and denigrating the District. More significant is the fact that it contained false and misleading statements. Such statements appeared to be intentionally divisive, inflammatory, and without just cause. It is believed that such statements were also purposefully perverse and improperly motivated.
>
> Such behavior, if deemed true, is a direct violation of the District's code of conduct. The Board is hereby providing you an opportunity to be heard on this matter before deciding whether further disciplinary action is warranted.

The Board voted to terminate Plaintiff's employment on September 24, 2012. Mays and Lee voted in favor of termination. Board Member Quinlisk-Dailey voted against termination. At the Board's directive, Randolph sent a letter to Plaintiff on September 26, 2012, notifying Plaintiff of his discharge. The letter stated:

> The Board accepted your admission and there from (sic) concluded that you circulated an email publicly defaming and denigrating the District without just cause. It was also determined that your statements were seditiously false and misleading as well as ill-intended, divisive, and retaliatory for prior discipline issued by the Board in good faith. Even though you admitted conveying such statements to, at least, one public entity; the number of other people and entities you actually conveyed them to is unknown. The Board found your explanation for

publicly expressing and circulating false and misleading information to others as not credible.

In deciding to vote in favor of terminating Plaintiff's employment, Mays and Lee considered that Plaintiff's email was motivated by a strained relationship with his superior officer, Farwell, and by a desire to retaliate against the Board Members for suspending him. They also considered the need for efficiency and loyalty within the workforce, the divisive nature of Plaintiff's email to Holland, and the false and misleading statements in the Holland email that Plaintiff knew, or should have known, to be false when he made them.

## IV.    DISCUSSION

In their Motion, Defendants claim there exists no genuine issue of material fact on the record before this Court, and Defendants are entitled to qualified immunity and judgment as a matter of law on Plaintiff's claims under Federal Civil Procedure Rule 56(a) [ECF Nos. 33, 34]. In determining whether a government official is entitled to a grant of summary judgment on the basis of qualified immunity, courts conduct a two-prong inquiry, first considering: 1) whether the facts alleged, taken in the light most favorable to the plaintiff, show a violation of a constitutional right; and 2) whether the constitutional right violated was clearly established at the time of the defendant's alleged misconduct. *Sisney v. Reisch*, 674 F.3d 839, 844 (8th Cir. 2012); *Bearden v. Lemon*, 475 F.3d 926, 928-29 (8th Cir. 2007).

If a public employee has been disciplined for engaging in protected speech, the next judicial inquiry becomes whether that discipline violated the First Amendment. This determination requires a careful balance "between the interests of the [employee], as a citizen, commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968).

Defendants argue, here, the Court need only address the second prong of the qualified immunity analysis, because Plaintiff cannot identify a clearly established right that Defendants should have known they might violate in terminating his employment. Defendants contend the proper inquiry is whether Defendants should have known, in light of pre-existing law, that it was illegal to take adverse action against Plaintiff for making false and defamatory statements about Fire District to the press. Defendants further claim they are entitled to qualified immunity because Plaintiff cannot show he had a clearly established constitutional right to make false and defamatory statements about Fire District. Defendants argue that Plaintiff's emails to Tan and Holland cannot be deemed speech by a private citizen regarding matters of public concern, because Plaintiff was speaking out as a disgruntled employee airing a private grievance. They contend, of the thirteen complaints made in his Holland email, only his statement about the expired narcotics license could arguably be an issue of public concern.

Plaintiff alleges he was discharged by Fire District in retaliation for his exercise of the right to free speech. The uncontroverted facts show Fire District terminated Plaintiff for publicly expressing and circulating the Holland email [ECF Nos. 34, 34-26]. The Eighth Circuit takes "a broad view of what constitutes clearly established law for the purposes of a qualified immunity inquiry." *Bearden*, 475 F.3d at 929. Even assuming all other allegations contained in the Holland email are false, Defendants concede the email's assertion regarding Fire District's expired narcotics license could be viewed as constitutionally protected speech. Viewed most favorably to Plaintiff, the Complaint's allegations show Plaintiff's speech was a basis for the Fire District's termination decision. The right not to be terminated for exercising such a First Amendment right was clearly established at the time of Plaintiff's termination. *Id.*

Defendants additionally argue, should the Court disagree that consideration of the first prong is unnecessary, they are still entitled to summary judgment, because they did not illegally infringe upon Plaintiff's First Amendment right to free speech. They contend the draft email to Dr. Tan is not protected by the First Amendment. Defendants first assert the email could not be "speech" because Plaintiff alleges he never sent it. Next, they argue Plaintiff cannot prove the draft email was a motivating factor in the Board's decision to suspend him for ten days. Defendants assert Defendant was suspended because he failed to respond to a direct order from his chief officer, requesting information. Thus, Defendants are asking this Court to determine they are entitled to qualified immunity as to the Tan email because Plaintiff was suspended for not complying with Farwell's directive to explain in writing Plaintiff's concerns concerning "'rule' bending for certain employees" [ECF Nos. 34-1, 34-3, 34-112, 34-12]. Essentially, Defendants are contending protected speech was not a substantial, or motivating factor in the termination decision. This causation question is a determination for the jury. *Shands v. City of Kennett*, 993 F.2d 1337, 1343 (8th Cir. 1993). Furthermore, the Court finds a genuine issue of material fact exists as to whether Plaintiff's protected speech was the motivating reason behind his suspension.

Finally, Defendants argue that, should the Court reach consideration of the second prong, and apply the *Pickering* test, the factors weigh heavily in favor of Defendants' right to promote efficiency in their public service, and against Plaintiff's right to make false and defamatory statements.

Governmental employers such as Fire District have a legitimate purpose in promoting efficiency and integrity in the performance of public service, and in maintaining proper discipline in the conduct of that service. *Shands*, 993 F.2d at 1344. To achieve this purpose, the

governmental employer must have broad discretion and control over its internal affairs and personnel management, including the prerogative to summarily terminate employees whose conduct hinders efficient operation. *Id.* "As a public safety organization, a fire department . . . has a more significant interest than the typical government employer in regulating the speech activities of its employees in order 'to order to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence' in its ability[.]" *Id.* at 1344 (quotation omitted).

In applying the *Pickering* balancing test to a governmental employee's speech, courts weigh six interrelated factors: 1) the need for harmony in the work place; 2) whether the government's responsibilities require a close working relationship between the plaintiff and co-workers and the speech has caused or could cause deterioration of the relationship; 3) the time, manner, and place of the speech; 4) the context in which the dispute manifested; 5) the degree of public interest in the speech; and 6) whether the speech impeded the employee's ability to perform his duties. *Shands*, 993 F.2d at 1344.

Applying the six factors to this case, the Court finds the balance weighs in favor of defendants. Firefighters and paramedics must follow their superior's orders and work together harmoniously to ensure not only their safety, but also that of the public. Thus, fire districts' decisions to terminate employees are accorded judicial deference. *Shands*, 993 F.2d at 1345. This deference is extended to both the district's determination that the protected speech had caused or would cause dissension and disruption, and to the district's response to the actual or perceived disruption. *Id.*

Giving Fire District's decision due deference, the Court concludes Mays and Lee reasonably believed Plaintiff's speech was an attempt to undermine Farwell's authority and had

led, or would lead, to disruption in the department. When Plaintiff's email to Holland was passed around the fire house, several employees were disturbed by its content, which they believed asserted numerous false statements. Many of Plaintiff's co-workers were angered by his decision to send such an email, and its content fostered division between Plaintiff and his co-workers, and between District firefighters and Farwell. Before writing his emails to Tan and Holland, Plaintiff never met directly with Farwell, Randolph, or the Board Members to discuss the concerns he professed to hold. Instead, he attempted to circumvent the chain of command, and he contacted a member of the media. Upon receiving the emails written by Plaintiff to Holland, the defendants became convinced the nature of Plaintiff's message was divisive and defaming, and was motivated by both his strained relationship with Farwell and a desire to retaliate against Board Members for suspending him.

The Court further determines Fire District's responsibilities require a close working relationship between the firefighters, paramedics, and their superior officers, such that more latitude in regulating the speech of an employee is warranted. "When lives may be at stake in a fire, an *esprit de corps* is essential to the success of the joint endeavor." *Shands*, 993 F.2d at 1344-45 (quoting *Janusaitis v. Middlebury Volunteer Fire Dept.*), 607 F.2d 17, 26 (2nd Cir. 1979)). Fire District firefighters responding to fires take directions and commands from Farwell and other Battalion Chiefs, thus placing their lives in the hands of these individuals. Personal loyalty to Battalion Chiefs is critical to Fire District's management structure. Distrust and eroded loyalty between co-workers and between firefighters and their Battalion Officers could cause emergency responders to hesitate in their actions, and to doubt their superior officers' calls, resulting in situations that could lead to the loss of lives.

Apparently, Plaintiff sent the email to Holland on his own time, outside the work place. However, his communication to Holland was not a purely private conversation; rather, it was intended by Plaintiff to reach the general public. The Court concludes the time, manner, and place of Plaintiff's speech is not entitled to a heightened level of protection. Plaintiff had to expect that his representations to Holland would raise questions, generate concern, promote division, and potentially disrupt the fire department.

As discussed earlier, the statement addressing Fire District's expired narcotics license would constitute protected speech. The majority of the statements contained in Plaintiff's email appear to arise from a personal dispute with Farwell and Fire District, and thus are not entitled to heightened protection. Considering the context of the dispute in which Plaintiff's speech arose, Fire District's decision to discharge Plaintiff warrants considerable deference.

The degree of public interest in the majority of statements made in the Holland email is insubstantial. However, the district's discovery that its state controlled-substances registration had expired was a matter of public concern, and it was the subject of discussion at a meeting of state health officials and in a newspaper article reporting on Fire District violations of state and federal controlled substance laws. Accordingly, this factor weighs in favor of Plaintiff.

Finally, the Court finds Plaintiffs' statements impeded the firefighters' ability to perform their duties as fireman. Plaintiff's actions exacerbated an already strained relationship between him and his superior officer, Farwell. Plaintiff ignored Farwell's directive to provide a written statement of the concerns Plaintiff professed in his email to Tan. The Holland email, passed around the fire house, negatively impacted the morale of Plaintiff's coworkers, and caused divisiveness and disruption within Plaintiff's department.

The Court finds the *Pickering* balance favors the defendants. Accordingly, it concludes Board's termination of Plaintiff, under the facts presented by this case, did not violate the First Amendment. The Court will grant Defendants' Motion for Summary Judgment.

**V.      CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [ECF No. 33] is **GRANTED.** Plaintiff's First Amended Complaint [ECF No. 53] is **DISMISSED with prejudice**, in its entirety.

Dated this  _17th_  day of March, 2014.

_____
E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE